UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

J.B. through his Guardians,
DONALD BELL AND BARBARA BELL;
and DONALD BELL and BARBARA
BELL, husband and wife, and
parents of J.B.,

                Plaintiffs,

        v.

MEAD SCHOOL DISTRICT NO. 354,

                Defendant.

NO. CV-08-223-EFS

**ORDER GRANTING MEAD'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
AND DENYING MEAD'S MOTION TO
EXCLUDE JUDITH BILLINGS**

    A telephonic hearing occurred in the above-captioned matter on December 1, 2010. Douglas Spruance and Robert F. Greer II appeared on behalf of Plaintiffs Donald and Barbara Bell; guardian ad litem J. Scott Miller appeared on Plaintiff J.B.'s behalf. Defendant Mead School District No. 354 was represented by Michael McFarland. Before the Court were Mead's Motion for Summary Judgment (ECF No. 40) and Motion to Exclude Judith Billings (ECF No. 46). After reviewing the submitted materials and relevant authority and hearing from the parties, the Court was fully informed and granted Mead's motion for partial summary judgment and denied its motion to exclude. This Order memorializes and supplements the Court's oral rulings.

ORDER * 1

**BACKGROUND**[1]

J.B., who suffers from autism and/or Asperger's disease, enrolled as a sophomore at Mead High School for the 2005-2006 school year. Before beginning classes at Mead, J.B.'s parents, the Bells, met with Assistant Principal Ron Chadwick to determine an education plan for J.B. Because Mead did not have a specific program for autistic students, J.B. was placed in special education classes and assigned a case manager, Shannon Moser, who also served as his teacher.

In spring 2006, J.B. was abused by two female students, D.R.D. and M.L.U., during "access time" on "block days,"[2] and on lunch hours. The

---

[1] The parties submitted a Joint Statement of Uncontroverted Facts (ECF No. 69). The Court treats these facts as established consistent with Federal Rule of Civil Procedure 56(d), and sets these forth in this "Background" section without a reference to an ECF number. Any facts supported by a citation to the record are disputed and are presented in the light most favorable to Plaintiffs. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[2] On "block days" Mead operated under a modified schedule, which allowed students who needed extra help to ask questions of their teachers. While classes typically began at 8:15 a.m. with busses arriving at 8:00 a.m., on block days, classes did not begin until 9:15 a.m., with busses arriving at the normal time. This period of delay was called "access time." While teachers and staff were required to be at school during access time, students were not. Those students who came to school but did not receive help from teachers were to remain in

abuse occurred when J.B. was playing "truth or dare," a game in which Mead special education students M.L.U. and D.R.D. would "order" other students, including J.B., to perform dares.[3]  The students played this game primarily in the field house, the "back room," the wrestling room, and the gym.[4]

A game that started relatively innocently evolved into a pattern of sexual and physical abuse of J.B.  Before May 2006, D.R.D. and M.L.U. hugged J.B. and directed him to kiss their bare buttocks or kicked J.B. in his buttocks.  They also dared him to hug the principal and touch another student's backpack.  On about five occasions, J.B. was ordered to touch M.L.U. and D.R.D.'s breasts and kiss other students.  In May 2006, J.B. was forced to pull his pants down and expose his genitals.  The girls spit into J.B.'s mouth, kicked him in the genitals,

---

certain designated areas of the school: the library, the mall area, or teachers' classrooms.  Vice Principal Ron Chadwick, who was responsible for all discipline and safety at Mead, and para-educator Lynn Coleman separately walked the halls during access time to supervise students.  Other staff members were located in the library, the mall, and in hallways, although most teachers were not available to supervise students outside the classroom.

[3] The students set up a "lookout," who would tell the students to "run" or "get out of there" if someone was coming.

[4] The back room is a hallway that connects the gym with the field house.  Students were prohibited from being in the gym and field house unless a teacher was present and supervising them.

ORDER * 3

struck his genitals with a skateboard, made him suck another student's genitalia, made another student suck J.B.'s genitalia, and sucked on or fondled J.B.'s genitalia.

Sometime in May 2006, teacher Wesley Graham entered the field house during the lunch hour to find M.L.U. sitting on top of J.B., both of whom were fully clothed. Both parties agree that J.B. was lying on the floor and that M.L.U. was on top of him. M.L.U.'s exact positioning, however, is disputed: J.B. claims that M.L.U. was laying on top of him, moving up and down, and "pretending to rape" or "hump" him (ECF No. 42, Ex. A, at 79-80); Mr. Graham recalls seeing M.L.U. "sitting astride," "hold[ing] [] down," or "wrestling" with J.B., but insists that he did not witness any sexual or abusive behavior (ECF No. 44, at 2-3; ECF No. 67, Ex. H, at 9-11). Mr. Graham immediately told the students to leave because he did not believe they were making productive use of the field house. Although all staff members had the authority, responsibility, and duty to take corrective action reasonably necessary to stop inappropriate behavior, Mr. Graham did not notify Mr. Chadwick or any other staff members of this incident.

On June 1, 2006, D.R.D. and M.L.U. forced J.B. to follow them into the back room, where they told him to pull his pants down and chase another student, M.E.F., around the room. J.B. complied, until he "realized that it didn't seem right for [him] to do that, so [he] stopped." M.E.F. left the room and told a staff member what had happened, who relayed this information to Mr. Chadwick. An investigation was initiated: Mr. Chadwick interviewed ten students and contacted the

ORDER * 4

Sheriff's Office.   Only then did J.B. disclose that the girls were sexually and physically abusing him.

The only time J.B. disclosed anything about M.L.U. and D.R.D.'s conduct was when he told Ms. Moser that D.R.D. told him to hug the principal and touch another student's backpack.   Not even Mrs. Bell, who was employed as a para-educator at Mead School District from 2006 through June 2008, knew of any sexual conduct.   She did, however, recall that J.B. had told her in January 2006 that D.R.D. had kissed him.   Mrs. Bell did not discuss the kissing with anyone at school until April 25, 2006; she believed that kissing was what kids do in high school and only revealed to her that J.B. was interacting with kids at school.   The Bells told J.B. that he should notify a teacher if anything inappropriate occurred.

M.L.U., who functioned between the third and fifth grade level during the relevant time period, had been disciplined for outbursts, defiance, cutting class, truancy, argumentative behavior, and refusal to cooperate with her teachers.   D.R.D.'s disciplinary record similarly indicates a history of truancy, use of profanity, dishonesty and cheating, lack of cooperation, restlessness and inattentiveness, leaving campus without permission, and being in unauthorized areas without supervision.   In fact, on March 2, 2006, Ms. Moser sent a letter to Mr. Chadwick advising that D.R.D. was such a disciplinary problem that she was to be monitored at all times, except for access time and the lunch period, and a written report was to be made for each period of the day.   (ECF No. 58, Ex. H.)

ORDER * 5

Although Mr. Chadwick knew of both girls' disciplinary history, he claims no knowledge of any bullying, harassment, or sexual-related misconduct before June 1, 2006. Ms. Enkema, a teacher who had D.R.D. in classes and knew M.L.U., claims she had no idea or suspicion that the girls were telling J.B. to do sexually inappropriate things. But at a March or April 2006 meeting, she had asked Ms. Moser to keep an eye on the situation between D.R.D. and J.B.

Mr. Chadwick suspended both girls for the remainder of the 2005-2006 school year, prohibited J.B. from taking any classes with his abusers, and assigned a one-on-one supervisor to walk J.B. to class. At Mr. Chadwick's request, D.R.D. transferred to another high school. Mr. Chadwick also contacted Elizabeth A. Pechous, Ph.D., who specializes in clients with autism, to provide counseling services to J.B. Dr. Pechous observed, diagnosed, and treated J.B. for issues surrounding the incident; these include PTSD, depression, anxiety with eating, and difficulty sleeping. Academically, J.B. has been preoccupied and distracted at school. J.B. told his mother that he considered ". . . killing himself so he wouldn't have to think about it anymore." (ECF No. 58, Ex. GG, p. 132.) J.B. was never physically or sexually touched at school again; he graduated in June 2008.

On June 9, 2008, the Bells filed this action in Spokane County Superior Court, alleging a number of negligence-based state law causes of action and two federal claims under Title IX and 42 U.S.C. § 1983. (ECF No. 1.) The case was subsequently removed to this Court. *Id*. On September 24, 2010, Mead filed the motions under consideration, which seek summary dismissal of the Bells' two federal causes of action and to

exclude Judith Billings, the Bells' liability expert, from testifying regarding school policies and procedures.

## DISCUSSION

### I.   Defendant's Motion for Summary Judgment (ECF No. 40)

#### A.   Summary Judgment Standard

Summary judgment is appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Once a party has moved for summary judgment, the opposing party must point to specific facts establishing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  If the nonmoving party fails to make such a showing for any of the elements essential to its case for which it bears the burden of proof, the trial court should grant the summary judgment motion.  *Id.* at 322.  "When the moving party has carried its burden of [showing that it is entitled to judgment as a matter of law], its opponent must do more than show that there is some metaphysical doubt as to material facts.  In the language of [Rule 56], the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (citations omitted) (emphasis in original opinion).

When considering a motion for summary judgment, a court should not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255.  This does not mean that

a court will accept as true assertions made by the non-moving party that are flatly contradicted by the record. *See Scott v. Harris,* 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

**B.    Title IX Claim**

Mead contends it is not liable for any alleged Title IX violations because a school official neither had actual knowledge that J.B. was being abused nor acted with deliberate indifference.  The Bells oppose the motion, submitting that a genuine issue of material fact exists for trial.

Title IX provides in pertinent part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."  20 U.S.C. § 1681(a).  The Supreme Court has held that a school district receiving federal funds may be liable for damages under Title IX when one student sexually harasses another.  *See Davis v. Monroe Cnty. Bd. of Educ.,* 526 U.S. 629, 633 (1999).  To establish such liability, a plaintiff must show: 1) he suffered sexual harassment that was so severe, pervasive, and objectively offensive that it could be said to deprive him of access to the educational opportunities or benefits provided by the school; 2) the funding recipient had actual knowledge of the sexual harassment; and 3) the funding recipient was deliberately indifferent to the harassment.  *Id.* at 650; *Reese v. Jefferson Sch. Dist. No. 14J*, 208

ORDER * 8

F.3d 736, 739-40 (9th Cir. 2000) (applying *Davis* standard).  The Court discusses each element in turn.

**1.  J.B.'s Access to Mead's Educational Opportunities or Benefits**

To prevail on the first prong of the *Davis* test, J.B. must prove he suffered sexual harassment so severe, pervasive, and objectively offensive that it could be said to deprive him of access to the educational opportunities or benefits Mead provided.  *Davis*, 526 U.S. at 650.  Mead concedes that the abuse was severe, pervasive, and objectively offensive, but argues that the Bells cannot establish the abuse deprived J.B. of access to any educational opportunities or benefits provided by the school.

To prove he was deprived of educational opportunities or benefits, the victim must show that the sexual harassment undermined and detracted from his educational experience in that he was denied equal access to the school's resources and educational opportunities.  *Id.*  The harassment need not have physically deprived the victim of such access, *id*. at 650; rather, the abuse must have had a "concrete, negative effect" on it.  *Id*. at 654; *Roe v. Gustine Unified Sch. Dist*., 678 F. Supp. 2d 1008 (E.D. Cal. 2009) (citing *Davis*).  "Examples of a negative impact on access may include dropping grades, being diagnosed with behavioral and/or anxiety disorders, becoming homebound or hospitalized due to harassment, physical violence, or sexual assault." *Roe*, 678 F. Supp. 2d at 1028 (internal citations omitted).  Here, J.B. endured consistent and substantial abuse throughout the spring of 2006.  He suffered stomach problems, sleeplessness, anxiety, and depression so severe that he sought counseling.  He was diagnosed with post-traumatic stress disorder,

anxiety disorder, and depression likely stemming from the abuse.  He began thinking suicidal thoughts.

Accordingly, the Court concludes that the abuse J.B. endured on school grounds was so prolonged and humiliating to create an issue of fact as to whether the abuse had a concrete, negative effect on his education.  *See Theno v. Tonganoxie Unified Sch. Dist. No. 464*, 377 F. Supp. 2d 952, 968 (D. Kan. 2005) (finding negative impact on victim's education or access when victim was diagnosed with anxiety or behavioral problems); *cf. Williams v. Bd. of Regents of the Univ. Sys. of Ga.*, (finding negative impact on victim's education under "extreme facts" of the case and when victim did not return to the university after the abuse).

### 2.  Mead's Actual Knowledge of the Abuse

To maintain his Title IX cause of action, J.B. must establish that an appropriate school official actually knew that he was being sexually harassed or abused.  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 283 (1998).  "[I]t is generally accepted that the knowledge must encompass either actual notice of the precise instance of abuse that gave rise to the case at hand or actual knowledge of at least a significant risk of sexual abuse."  *Ross v. Corp. of Mercer Univ.*, 506 F. Supp. 2d 1325, 1347-48 (M.D. Ga. 2007).  Thus, it is not enough to show that the school district "should have known" of the abuse.  *Gebser*, 524 U.S. at 283; *Reese*, 208 F.3d at 739; *Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 823 (7th Cir. 2003).

The Court finds that the Bells have failed to present sufficient evidence to create a genuine issue of material fact as to whether any

ORDER * 10

Mead official had actual notice.   There is no evidence that any administrative official had notice of any sexual behavior or harassing conduct by M.L.U. or D.R.D. toward J.B. before June 1, 2006.  At most, administrators knew that J.B. had kissed D.R.D., hugged the principal, and touched another student's backpack, which does not amount to sexual abuse or harassment.   And once Mead learned of the abuse, it took immediate corrective action: it suspended D.R.D. and M.L.U., facilitated D.R.D.'s transfer to another high school, ensured that none of the students involved attended the same classes, and assigned a full-time supervisor for J.B.   *See Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir. 1999) (affirming summary judgment dismissal of Title IX claim against school district because school district did not have actual notice of sexual assaults until "after the fact" and, upon notice, "quickly and effectively" corrected the situation).

Nor is there any evidence that M.L.U.'s and D.R.D.'s disciplinary history put Mead on notice of a significant risk that they might sexually abuse another student.   That disciplinary history did not reveal that M.L.U. or D.R.D. had engaged, or would likely engage, in any sexualized behavior against another student during school hours.   *See Ross*, 506 F. Supp. 2d at 1347-48 (finding school's knowledge of abuser's substance abuse history does not amount to actual knowledge that the abuser might sexually assault another student); *cf. Williams*, 477 F.3d at 1293 (finding school's knowledge that student had been dismissed from two previous colleges after allegations that he had sexually assaulted two women and harassed another could constitute actual notice that he might sexually assault other students).

ORDER * 11

Thus, the only remaining question is whether the Bells' Title IX claim survives on an issue of fact as to whether Mr. Graham actually knew that J.B. was being sexually abused when he personally witnessed M.L.U. sitting atop J.B. in the field house during lunch in May 2006.  The Court finds it does not.

As an initial matter, Mr. Graham, like all teachers at Mead, was an appropriate person for Title IX purposes because he had the authority to address the alleged discrimination and to institute corrective measures on J.B.'s behalf.  *See Gebser,* 524 U.S. at 298 (defining "appropriate person"); *Murrell v. Sch. Dist. No. 1 of Denver*, 186 F.3d 1238, 1248 (10th Cir. 1999) (recognizing that "teachers may well possess the requisite control necessary to take corrective action to end the discrimination").

Yet, the Court concludes that Mr. Graham did not have actual knowledge of J.B.'s abuse for Title IX purposes.  The parties agree that when Mr. Graham entered the field house, J.B. was lying on the floor, M.L.U. was on top of him, and both students were fully clothed.  The parties' perceptions of the events taking place, however, differ.  J.B. claims that M.L.U. was laying on top of him, moving up and down, and "pretending to rape" him, while Mr. Graham recalls seeing M.L.U. "sitting astride," "hold[ing] [] down," or "wrestling" with J.B. but certainly nothing sexual or abusive.  The fact that Mr. Graham's perception contradicts J.B.'s does not create an issue of fact: J.B. cannot testify as to what Mr. Graham perceived, and Mr. Graham has unequivocally testified that he did not perceive anything sexually suggestive.

ORDER * 12

But even assuming Mr. Graham perceived exactly what J.B. said occurred—that M.L.U. was "humping" or "pretending to rape" him—there is still no evidence that J.B. was being sexually abused or faced a significant risk of sexual abuse.    What Mr. Graham witnessed was, at most, two students engaging in a consensual sexual act.    In *Liu v. Striuli*, the district court of Rhode Island found that two college administrators' knowledge of a sexual relationship between a professor and graduate student did not amount to actual knowledge that the student was being sexually abused because there was no evidence that the relationship was not mutually consensual.    36 F. Supp. 2d 452, 460 (D.R.I 1999).    Indeed, the administrators maintained that "the couple held hands, kissed, and seemed to have affection for one another" in social settings.    *Id*.

Here, as in *Liu*, there is no evidence that Mr. Graham knew the relationship was anything but consensual.    *Id*. at 465-66.    J.B. and M.L.U. were in a sexually suggestive position, but J.B. did not struggle or cry out to Mr. Graham for help.    And because M.L.U. was slightly built,[5] her physical presence was not objectively coercive.    It is not infrequent that teenagers exhibit sexualized behavior, sometimes while at school, but that does not imply abuse.    There is simply no evidence that M.L.U.'s advances were uninvited.    Without such evidence, the Court cannot conclude that Mr. Graham had actual knowledge of a significant risk that J.B. was being sexually abused.

---

[5] M.L.U. recalls weighing only ninety-five (95) pounds at the time of the incident.    (ECF No. 67, Ex. E, at 60.)

ORDER * 13

A review of all the cases only substantiates the Court's conclusion. *See Doe v. Flaherty*, 2010 WL 4068748 (8th Cir. Oct. 19, 2010) (finding no actual knowledge despite district's knowledge of two inappropriate texts from teacher and report from parent that they spent time together and that "something was going on" between them); *Rost v. Steamboat Springs Sch. Dist.*, 511 F.3d 1114 (10th Cir. 2008) (finding learning-disabled student's statement to school counselor that boys were "bothering her" did not provide school district with actual knowledge, notwithstanding parent's pleas to counselor to find out what was bothering student); *Baynard v. Malone*, 268 F.3d 228 (4th Cir. 2001) (finding that elementary school principal did not have actual notice despite complaints of past abuse by teacher and other teacher's observation of physical contact between victim and teacher-abuser); *P.H. v. Sch. Dist. of Kan. City*, 265 F.3d 653, 659 (8th Cir. 2001) (finding combination of district's knowledge of teacher's abuse of student twenty years ago and excessive time spent with the instant student resulting in tardiness and falling grades insufficient to constitute actual knowledge); *Davis v. DeKalb Cnty. Sch. Dist.*, 233 F.3d 1367, 1372-73 (11th Cir. 2000) (finding student's complaint that teacher "touched her behind" when she was hiking a football and later "tried to touch her at the water fountain" insufficient to alert district); *cf. Vance v. Spencer*, 231 F.2d 253, 257 (6th Cir. 2000) (upholding a jury verdict for female student where student was repeatedly propositioned, groped, and threatened by a fellow student several times in presence of teacher).

Taking J.B.'s assertion that M.L.U. was "pretending to rape" or "hump" him as true and without weighing evidence or assessing

credibility, the Court finds no issue of fact.   While the Court is sympathetic to the challenges J.B. faces and the anguish his parents must feel knowing of the abuse their son endured, it cannot conclude that an appropriate school official actually knew that J.B. was either being, or at a significant risk of being, sexually harassed or abused.   Accordingly, the Court **GRANTS** Mead's motion for summary judgment and dismisses the Bells' Title IX, 20 U.S.C. § 1681, claim.[6]

### C.    42 U.S.C. § 1983 Claim

Mead argues that the Bells' 42 U.S.C. § 1983 claim must be dismissed because they cannot show that Mead deprived J.B. of a constitutional right, had policies or customs which evinced deliberate indifference to abuse, or that such customs or polices caused the abuse.   The Bells do not oppose Mead's partial summary judgment motion on the § 1983 claim.

To state a claim under § 1983, a plaintiff must show a defendant, acting under state law, deprived a plaintiff of rights secured by the Constitution or federal statutes.   *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986); *see also L.W. v. Grubbs*, 974 F.2d 119, 120 (9th Cir. 1992).   Government entities are "persons" under § 1983 and thus may be liable for causing a constitutional deprivation.   *Monnell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).   But such entity may not be sued under § 1983 solely because one of its employees or agents inflicted injury.   *Id*.   For government entity to be liable for its failure to act, a plaintiff must show:

---

[6] Having found that Mead did not have "actual knowledge" that J.B. was being sexually abused, the Court need not address the last element, whether Mead acted with deliberate indifference.

ORDER * 15

> (1) that a [government] employee violated the plaintiff's constitutional rights; (2) that the [government entity] has customs or policies that amount to deliberate indifference; and (3) that these customs or policies were the moving force behind the employee's violation of constitutional rights.

*Long v. Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006).

Mead argues, and the Bells do not dispute, that Mead was not directly responsible for depriving J.B. of his right to bodily security. Generally, a lack of due care by a state actor does not deprive an individual of due process rights. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). Indeed, the Due Process Clause does not confer an affirmative right to government aid. *Id*. Nor does it require a state to "protect the life, liberty, and property of its citizens against invasion by private actors." *Id.; see also Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th Cir. 2008). There are two exceptions to the general rule that a state's failure to protect an individual from danger does not violate due process: first, when a "special relationship" exists between the state and the individual, and second, when a state affirmatively places the individual in a dangerous situation. *Estate of Amos ex rel. Amos v. City of Page, Ariz.*, 257 F.3d 1086, 1090 (9th Cir. 2001) (citing *Huffman v. Cnty. of Los Angeles*, 147 F.3d 1054, 1058 (9th Cir. 1998)).

Neither of these two exceptions apply here. No special relationship exists between Mead and J.B. because J.B. was not in custody or held against his will when the abuse occurred. *Deshaney*, 489 U.S. at 199-200; *Amos*, 257 F.3d at 1090 (recognizing no affirmative duty exists to ensure "safety and general well-being" if plaintiff is not in custody or held against his will); *Monohan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d

987, 991 (1st Cir. 1992) ("[H]ere, where no such involuntary commitment has occurred, [Plaintiff's] 'special relationship' argument is without force."). Nor is there any evidence that Mead subjected or affirmatively placed J.B. in a dangerous situation. *See Munger v. City of Glasgow*, 227 F.3d 894, 900 (9th Cir. 2000) (recognizing that state actors may be held liable "where they affirmatively place an individual in danger"). Accordingly, the Court finds that Mead did not deprive J.B. of a constitutional right.

Because the Bells cannot establish that Mead violated J.B.'s constitutional right, no further analysis is necessary. But even assuming they could, the Bells still must establish that Mead has customs or policies that amount to deliberate indifference to that right, *Monell*, 436 U.S. at 690-91, and "that the injury would have been avoided" had proper policies been implemented, *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1174, 1196 (9th Cir. 2002). "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001). Here, the Bells fail to identify, and therefore fail to prove, that any custom or policy of inaction amounts to "deliberate indifference" to J.B.'s constitutional rights or that the policy or custom could have prevented the conduct in question. Accordingly, the Court **GRANTS** Mead's motion for summary judgment and dismisses the Bells' 42 U.S.C. § 1983 claim.

**II.  Defendant's Motion to Exclude Judith Billings (ECF No. 46)**

ORDER * 17

Mead moves to exclude the testimony of Judith Billings, the Bells' expert on school policies and procedures regarding supervision of special education students.  Mead argues that 1) Ms. Billings' opinions are not the proper basis of expert testimony, and 2) she lacks the requisite qualifications to opine on Mead's supervision of its special education students.  The Bells oppose Mead's motion.

Federal Rule of Evidence 702 imposes an obligation on the trial judge to screen expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (2010).  Once a proffered expert's testimony is challenged, the district court has a "gatekeeping responsibility" to ensure the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999); *see also Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997).  The Court's gatekeeper role applies not only to scientific testimony, but all testimony. *Kumho Tire Co. Ltd.*, 526 U.S. at 148.  The proponent of the expert has the burden of proving, by a preponderance of evidence, that the expert's testimony is admissible. *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *Daubert*, 509 U.S. at 592

ORDER * 18

n.10.  Because Mead challenged Ms. Billings' proffered expert testimony, the Court engages in its gatekeeping responsibility.

### A.   Fact in Issue

Through expert testimony, the Bells intend to prove that Mead's supervision of J.B. did not meet the applicable standard of care.  Ms. Billings was retained by the Bells to conclude that, based on her expert opinion and specialized knowledge of Washington schools' policies, practices, and procedures, Mead's conduct violated laws and protocols requiring it to monitor or supervise the special education students involved in the abuse.

Mead argues that Ms. Billings' opinion is improper because it simply recites the law and applies to this case.  "It is well-established . . . that expert testimony concerning an ultimate issue is not per se improper." *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1066 n.10 (9th Cir. 2002).  Indeed, Federal Rule of Evidence 704(a) provides that expert testimony that is "otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  But an expert witness cannot opine as to her legal conclusion: an opinion on an ultimate issue of law.  *See Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016-17 (9th Cir. 2004); *see also United States v. Unruh*, 855 F.2d 1363, 1376 (9th Cir. 1987); *United States v. W.R. Grace*, 455 F. Supp. 2d 1156, 1166 (D. Mont. 2006).

Ms. Billings will testify that as a result of being allowed to go into these secluded, closed rooms without supervision, the special education students were able to abuse and harass J.B. throughout the spring of 2006.  To support this proposition, she points to laws that

ORDER * 19

govern teachers and administrators in supervising special education students.[7]

Here, because teachers and administrators' decisions regarding supervision are largely informed by the laws and policies Ms. Billings cites, her testimony is accurate and helpful to the jury. *See* Fed. R. Evid. 702 (recognizing that expert opinion must "assist the trier of fact to understanding the evidence or to determine a fact in issue"). And by referring to the law governing teachers and administrators, Ms. Billings does not instruct the jury on the law at issue or state a legal conclusion; rather, she uses these statutes to define the applicable standard of care in a negligence action. The Court concludes that even though it is not relevant to the summary judgment motion, Ms. Billings' testimony, including references to the general law, will assist the trier of fact in 1) understanding the applicable standard of care and 2) ultimately determining whether Mead breached that standard.

**B.  Qualifications**

Mead argues that Ms. Billings is not qualified to testify regarding the policies and procedures for supervision of special education students because she has: 1) not worked in a school district since 1978, twenty-

---

[7] For example, when asked to define the applicable standard of care that she believes Mead breached, she pointed to the doctrine of *in loco parentis*: how a reasonably responsible parent would supervise his or her child. She also references WAC 392-172A-1175, which sets forth the goals and purposes of special education, and RCW 28A.300.285, Washington's Anti-Bullying Statute, to support her opinion.

ORDER * 20

eight years before the conduct giving rise to this litigation; 2) no experience acting as an administrator in a large high school; and 3) not worked with special education students in thirteen years.

To determine whether a witness is qualified to offer expert opinions, the district court assesses the witnesses' experience, training, education, knowledge, and skill. Fed. R. Evid. 702; *United States v. Vallejo*, 237 F.3d 1008, 1018 (9th Cir. 2001). Although experience is often the only basis for reliable expert testimony, Fed. R. Evid. 702 adv. committee note (2000), an expert who relies on experience must "explain how that experience leads to the conclusion reached, why the experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.*

Ms. Billings has over forty-seven years of experience in primary and secondary education. A former teacher and administrator, Ms. Billings has worked on education policy, including holding the position of Superintendent of Public Instruction for the State of Washington for two full terms from 1989 to 1997. While serving in this capacity, Ms. Billings regularly consulted educators throughout the state, testified before the Washington State Legislature, and served on education-related boards and committees regarding safety, supervision, and monitoring of special education students. She also oversaw and implemented special education programs. Since then, she has been retained by twenty-four different law firms to testify as to appropriate supervision, hiring, and district practices regarding student safety, ten of which involved special education students, and seven of which involved student-on-student harassment. The Court concludes that Ms. Billings' significant

experience qualifies her to render opinions on standard of care issues involving special education students.

**C.  Basis and Fit**

Mead argues that Ms. Billings' opinions about the applicable standard of care is not appropriate expert testimony because it is neither scientific or technical, nor involve other specialized knowledge. Mead also argues that in arriving at her opinions, Ms. Billings did not perform any kind of research or survey as to how school districts in Washington supervise special education students.

Federal Rule of Evidence 702 requires (1) an expert's testimony to be based upon sufficient facts or data, (2) the testimony to be the product of reliable principles and methods, and (3) the expert must apply the principles and methods reliably to the facts of the case.  Fed. R. Evid. 702.  *Daubert* set forth several factors for the court to consider while considering the principles and methodology, 509 U.S. at 593-95; these factors are flexible, and include whether the theory is testable, has been subject to peer review and publication, or generally accepted. *Id*.  These factors are, however, merely illustrative and not applicable in cases where the proffered expert testimony is based on personal experience rather than scientific studies.  *Daubert*, 43 F.3d at 1316-17 (9th Cir. 1995).  Accordingly, the central focus of *Daubert*'s reliability gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. Ltd.*, 526 U.S. at 152.

Here, Ms. Billings bases her testimony on a life-long study of education policy and personal experience as a teacher and policymaker. She has demonstrated that she can and will employ a high level of intellectual rigor when rendering opinions about the applicable standard of care and whether Mead breached it. Mead has failed to point to any part of her testimony that is unsupported by sufficient facts, is unreliable, or incorrectly applies the facts to her experience. The Court is satisfied that Ms. Billings' testimony is the proper basis for an expert opinion and that she has reliably applied these conclusions to the facts of this case. Accordingly, Mead's motion to exclude Ms. Billings' testimony is **DENIED**. Ms. Billings may testify at trial regarding school district standards and the reasonableness of Mead's actions; she may not, however, opine as to whether Mead is ultimately liable for breaching that standard of care.

## III. Supplemental Jurisdiction

This Court has jurisdiction over the remaining state law claims under 28 U.S.C. § 1367(a), because they arise from the same facts as the Bells' federal Title IX and 42 U.S.C. § 1983 claims. This Court may decline to exercise its supplemental jurisdiction if "the district court has dismissed all claims over which it had original jurisdiction." 28 U.S.C. § 1367 (c)(3). Yet, the Court *may* retain jurisdiction after the basis for original jurisdiction is removed. *Watkins v. Grover*, 508 F.2d 920, 921 (9th Cir. 1974). To determine whether to retain or decline jurisdiction, a district court may appropriately consider "the values of economy, convenience, fairness, and comity." *Harrell v. 20th Century*

1  *Ins. Co.*, 934 F.2d 203, 205 (9th Cir. 1991) (quoting *Carnegie-Mellon*
2  *Univ. v. Cohill*, 484 U.S. 343, 351 (1988)).

3      This case has been pending in this Court for over two years.  During
4  this time, the Court has ruled on discovery and case scheduling issues,
5  becoming familiar with the factual and legal details of the dispute.
6  Economy and fairness therefore favor retention.  Because the parties do
7  not jointly request remand, the Court retains supplemental jurisdiction
8  over the Bells' state law claims pursuant to 28 U.S.C. § 1367(a).

9      Accordingly, **IT IS ORDERED**:

10     1.  Mead's Motion for Summary Judgment **(ECF No. 40)** is **GRANTED**.

11     2.  Mead's Motion to Exclude Judith Billings **(ECF No. 46)** is **DENIED**.

12     3.  The Court retains supplemental jurisdiction over the remaining
13  state law claims.

14     **IT IS SO ORDERED.**  The District Court Executive is directed to enter
15  this Order and forward copies to counsel.

16     **DATED** this _____10th_____ day of December 2010.

17

18                         S/ Edward F. Shea
                   _____
                         EDWARD F. SHEA
19                   United States District Judge

Q:\Civil\2008\223.Partial.MSJ.Final
20

21

22

23

24

25

26

ORDER * 24